## Graf v. Woodruff.

(Decideed June 21, 1932.)

LAWRENCE S. POSTON for appellant.

HARRY L. HARGADON, WM. T. McNALLY, and A. W. DORSEY for appellee.

OPINION OF THE COURT BY STANLEY, COMMISSIONER— Reversing.

The appellant, Chester L. Graf, as plaintiff, claimed that he and the defendant, Wallace G. Woodruff, in May, 1925, formed a partnership under the style of Wallace G. Woodruff Construction Company for the purpose of operating a stone quarry near St. Croix, Ind., and furnishing crushed rock for the Hays Construction Company, which had a contract to build a certain road in southern Indiana. The terms of the partnership agreement alleged were that each member was to put up $5,000, and that Woodruff should have the active management of the operations and receive $25 a week as personal expenses, and the profits were to be divided equally. The defendant claimed there was no partnership and that he was employed on a salary of $25 a week during the operations and for 50 per cent of the profits. The petition stated that the plaintiff had advanced $20,815.77, and that the company had suffered a deficit from its operations of $19,590.93, one-half of which the plaintiff claimed was due him by the defendant. It was also charged that the defendant was indebted to the firm in the sum of $1,598.83 for certain items. The defendant

asserted a counterclaim for $600 for wages due and $2,790 for machinery and tools sold by him to Graf and used in the enterprise. The commissioner of the court found and reported that there was a partnership between the two men and that the defendant was due the plaintiff one-half of the deficit and was entitled to nothing on his counterclaim. Upon review the chancellor held that the proof did not establish a partnership, awarded judgment against the defendant for $1,598.83, and dismissed the counterclaim. Only Graf appeals.

The conditions which establish a partnership are indefinite and various, and it is often difficult to determine whether such relation existed between the parties making the issue. In the recent case of Crider v. Providence Coal Mining Company, 242 Ky. 514, 46 S. W. (2d) 1072, the subject of partnership received careful consideration, and some of the accepted tests are mentioned and general rules outlined by which the existence or nonexistence of that relation may be regarded as established. As therein stated, the sharing of profits is usually accepted as evidence of the status, although if that be but a method or standard of compensation for services the rule fails. In the case before us we have a clear contradiction in the verbal evidence of the parties as to whether there was ever any such purpose or any consummation of that intention. So we must look to the circumstances disclosed and the admissions made.

The appellant is a merchant of New Albany, Ind., handling among other things road contractors' supplies. He testified that Van Hoy, a representative of the Hays Construction Company, called to see him in May, 1925, about the purchase of a stone crusher or about finding someone to crush rock for his company in the construction of the road which it had contracted to build. He took Van Hoy to see Woodruff at Sellersburg, where he was engaged in crushing rock. This led to conversations as to making a contract with the Hays Company and Woodruff requested him to join him in the venture. They went over the location and agreed on a partnership for that purpose. His identity with the firm was to be concealed in order that he might sign the contract as a bondsman. It was specifically agreed that Graf would put up the first $5,000 and Woodruff the second $5,000 as working capital. Woodruff was to have charge of the work and was to receive $25 a week for the maintenance of his fam-

ily while he was away from home on business for the company. It is pretty well shown that the Hays Construction Company understood at first that it was contracting only with Woodruff individually. It had prepared a form of contract accordingly, but before it was signed the abbreviated words "Const'n Co." were added to Woodruff's name and the instrument was signed by Woodruff as the "Wallace G. Woodruff Construction Company." Graf and Woodruff went together to La Gootie, Ind., and bought some equipment from a bank which had acquired it from a bankrupt estate. Graf paid the bank $1,200 in cash and Woodruff individually executed notes for $2,800, which, however, it was understood were to be paid by the company and which were so paid. After the $5,000 put up by Graf had been expended, he requested Woodruff to pay in that sum as he had agreed, but Woodruff wanted him to go his surety at the bank that he might raise it. Graf responded that he had as well borrow the money himself and put it in, and this he proceeded to do. He continued to advance money for the enterprise until it exceeded $20,000. Graf testified that Woodruff never contributed any money but did put in machinery and tools which he owned and had used in his own operations and there was no payment or promise of payment to him for it. It appears that the value of that machinery was placed on the books as an asset. There is evidence of several statements by Woodruff to disinterested parties to the effect that he and Graf were partners. About a year after the work was begun, Graf ceased putting up money for the pay roll. Reasons which he assigned for doing so are not very persuasive, and it would seem that the real cause was that he realized that he had entered upon a losing venture. At any rate, the Hays Construction Company assumed completion of the job, took care of the expenses of operating the quarry, and paid Woodruff, as its superintendent, $45 a week. Graf says that he had no knowledge of the payment of this salary. There were some other small operations, but finally it was agreed that Robert Leist should dispose of the equipment "used by the Woodruff Construction Company in the tranaction of their business as road contractors" and pay the debts. To accomplish this, Woodruff executed a power of attorney as "one of the partners of the Woodruff Construction Company." In an auditor's report made in October, 1926, Woodruff signed a memorandum tending to show that he was a partner.

He had collected money, given receipts, indorsed checks, and otherwise conducted the business as if he were a proprietor or owner.

Woodruff specifically denies that he made any proposition to form a partnership and relates that he told Graf he could not handle the contract because he was "worse than broke." Later he visited Graf at his invitation and went over the job with him and they both thought some money might be made out of it. Graf suggested and it was agreed that he would finance it and that Woodruff would do the work on the same basis that he had been working for Gaines; that is, that he would get $25 a week and 50 per cent of the profits for his services. Graf, being in the business of handling road contractors' supplies, did not want his name used, and hence the contract was taken in the name of the Woodruff Construction Company. They bought the bank's equipment as related by Graf, but Woodruff says Graf informed the banker that he would take care of the notes, and so far as Woodruff knew he did so, as he never heard of them afterwards. Woodruff continued in charge of the operations and Graf never came about. The records were kept at Graf's office and he attended to all the financial business. However, Woodruff admits buying supplies for the camp and that he otherwise assumed to act as if he were the owner and proprietor. He denied the admissions attributed to him that he was a partner, except he says he may have unintentionally used that term in referring to his working agreement, but he never felt any personal responsibility for the business. The memorandum on the auditor's report was simply a statement to the effect that the expenditures shown had been authorized by him as Graf's superintendent and had exceeded the estimate in the amount stated. He executed a power of attorney to Leist because the equipment had been purchased in his name and in order that Graf could get his money out of it. He admitted that Graf never paid for the equipment which had been put in the enterprise at its inception. This he valued at $2,890.

Van Hoy was introduced by the defendant and testified that he was referred to Woodruff by Graf as a suitable subcontractor and thereafter had several conversations with Graf about the matter. Van Hoy learned that Woodruff had nothing, but Graf was well-to-do and he was given to understand by Graf that he was financing

the job. When the contract between the two companies was executed, there was no discussion as to the interlineation of the words "Const'n Co." after Woodruff's name. It is not clear who did this or caused it to be done. Asked if there was a conversation between Woodruff and Graf relative to the arrangement between them, the witness stated the substance was "they talked over the working arrangements, that it was a partnership arrangement, as it was talked over in my presence and I understood it from Mr. Graf." A representative of the Staebler Construction Company, for whom some stone had been crushed by Woodruff after the Hays contract was abandoned or completed, testified that in an effort to reach a settlement, Graf stated that Woodruff had nothing to do with the company and had sent him there to run the plant. About that time the street commissioner of Sellersburg, who had bought some rock from Woodruff, asked Graf what he had to do with it. Graf told him he had everything to do with it as he owned the whole business. Another witness stated that Graf told him Woodruff did not have anything to do with collecting the money for the company. However, there is no evidence of any admission by Graf inconsistent with a claim of a partnership until after trouble had arisen and he was standing to lose all that he had put into the business as there was little, if any, chance then of recovering any part of it from Woodruff. Woodruff's manner of testifying as reflected in the deposition tends to weaken what he says about several things. He contradicted nearly every other witness introduced in the case on one or more points.

It seems to us that the evidence establishes the existence of a partnership. The opinion of the chancellor indicates some doubt in his mind as to the correctness of his conclusion. He was of the opinion that the evidence tended to show that even if there had been an original intention to form a partnership that intention was abandoned. He considered as cogent reasons for that conclusion that Graf had contributed over $20,000 and Woodruff had put in nothing, and that he would not have continued financing a losing venture for three or four years without making an effort to have Woodruff make his promised contribution. The court doubtless overlooked the fact that Woodruff had contributed nearly $3,000 worth of equipment owned by him personally and that he had become obligated for $4,000 worth of equipment

purchased. Perhaps Graf would have been justified in terminating the relation when Woodruff was unable to put up $5,000 in cash when requested, as he claimed, but he did not, and the status continued as theretofore. We do not think it is especially significant that Graf waited some time before filing his suit, as suggested by the court, for it was filed shortly after it appeared that the defendant had come into an inheritance from his father and he had been claiming to be insolvent. Certainly, as much could be said as to the delay of Woodruff in waiting until suit was filed by Graf before making a claim against him for a considerable sum on account of wages, and $2,790 as payment for equipment furnished by him for the venture. Woodruff's activities were more than those ordinarily exhibited by a superintendent or employee. He had the entire control of the operations and Graf never went about the job, but held up his part by looking after the records and finances. The name of the company has some significance, and Woodruff held himself out to be a partner and assumed liability to others as such. These things, coupled with other circumstances and inferences to be gathered from them, which need not be stated, it seems to us, sustain the plaintiff's claim that there was a partnership created and never abandoned until after liability attached.

Inasmuch as the chancellor found there was no partnership, other issues went out of the case. A reversal of the judgment revives them, and the matters of account reported by the commissioner should be reviewed and judgment rendered thereon.

Judgment reversed, and case remanded for consistent proceedings.