Stephan F. ROETHKE; Karen M. Roethke; Kaela Roethke; and Stephanie Roethke, Appellants,

v.

Larry SANGER, Appellee.

No. 2000–SC–0202–DG.

Supreme Court of Kentucky.

Dec. 20, 2001.

Rehearing Denied March 21, 2002.

Kenneth H. Baker, James Scroghan, Baker and Scroghan, Louisville, Counsel for Appellant.

W.R. Patterson, Jr., Jennifer Jordan Hall, Louisville, Counsel for Appellee.

COOPER, Justice.

A Jefferson Circuit Court jury awarded Appellants Stephan F. Roethke, Karen M. Roethke, Kaela Roethke and Stephanie Roethke judgments against Appellee Larry Sanger in the total sum of $2,659,560.40. The Court of Appeals reversed, holding that the trial judge erred in overruling Sanger's motion for a directed verdict. We granted discretionary review and now affirm the Court of Appeals. In doing so, we will address the three theories of agency advanced in support of vicarious liability in this case: (1) partnership; (2) ostensible agency; and (3) joint enterprise. But first, the facts.

## I. FACTS.

Appellant Stephan Roethke was the owner and president of D & B Roofing Corporation. His wife, Appellant Karen Roethke, was the secretary/treasurer. D & B was engaged in the business of repairing and installing roofs on commercial buildings. In addition to the Roethkes, D & B employed a sales representative, an operations manager, a construction foreman, and 14—15 union roofers. Although its corporate headquarters was in Louisville, D & B bid, accepted and performed roofing jobs throughout the Commonwealth of Kentucky. In the fall of 1992, Stephan Roethke negotiated a contract for D & B to remove a 16,000 square foot roof from an industrial plant building owned by Gamble Brothers/Masonite Corporation in Monticello, Kentucky, and replace it with a standing seam metal roof. The contract price was $46,784.00. D & B's construction foreman, Jack Taylor, was supervising another job in Radcliff, Kentucky, so Roethke hired Chris Sanger, then age twenty-three, to supervise D & B's em-

ployees in the performance of the Gamble Brothers' job.

Chris Sanger was not in the roofing business and had no employees. He owned a 10–ton RO Stinger hydraulic crane mounted on a 1975 Ford L–9000 tractor truck that he used in an unincorporated crane service business known as "Sanger Crane Service." He charged $55.00 per hour to operate his crane on lifting jobs for construction contractors who did not own cranes of their own. Although Sanger had helped build some metal garages when he lived in Pennsylvania, he had never participated in the installation of a roof of this size or type. Roethke knew that, so he gave Sanger a booklet published by the roof supplier, Metal Sales Company, that described the proper method of installation of a standing seam metal roof. D & B paid Chris Sanger a salary of $250.00 per day to supervise D & B's employees and $100.00 per day for the use of his crane, and reimbursed all of his travel and living expenses related to the Gamble Brothers job. The crane was used only about twenty minutes per day to lower old roof panels off the roof and hoist new panels up to the roof. Roethke testified that he agreed to the $100.00 per day payment because Sanger needed the money to make his payments on the crane. All payments of salary, crane work, and expenses were made by checks issued by D & B payable to "Chris Sanger." No checks were issued payable to "Sanger Crane Service." The work on the Gamble Brothers job commenced on December 17, 1992, and concluded in mid-January 1993.

At some point prior to the commencement of the Gamble Brothers job, Roethke, on behalf of D & B, offered Sanger a full-time job as a construction supervisor at a salary of $50,000.00 per year, plus expenses. Sanger testified that he accepted the offer during a telephone conversation with Roethke on December 27, 1992, and that Roethke said he would visit the Monticello job site the next day to finalize the agreement. Roethke admitted he offered the position of permanent employment to Sanger and that Sanger accepted the offer. Roethke, however, maintained that the agreement was never finalized because the two could not agree on what to do with Sanger's crane. On December 28, 1992, Roethke and his Lexington sales representative, Mike Wheeler, visited the Gamble Brothers job site. Chris Sanger was working on the roof with other D & B employees. Roethke and Wheeler climbed a ladder to the roof, and Sanger testified at trial that Roethke said to Wheeler: "Meet Chris Sanger, the new addition to our company."

Both the old and the new roof consisted of metal panels. The panels of the old roof were fastened together by metal screws bored through the top of the panels. The panels of the new standing seam roof were fastened together by clips attached underneath the panels. So as not to leave the building completely uncovered, the technique used for the removal and installation was to start at one end of the building and work to the other end, removing the old panels and replacing them with the new panels as the work progressed. There would always be a narrow open space where old panels had been removed, but new panels had not yet been installed, and where the roof insulation was, thus, exposed.

Wheeler had a camera and began taking photographs of the work in progress. Plaintiff's trial exhibit No. 1 is a photograph that shows Stephan Roethke standing on the old section of the roof within a few feet of the exposed insulation, apparently talking to Macy Williamson, a D & B employee, who was on his knees on the other side of the exposed section, clipping

a new panel to the new section of the roof. The narrow section of exposed insulation is clearly visible between Roethke and Williamson. The photograph also shows Chris Sanger working on the new section behind Williamson with his back to Roethke. As Roethke walked forward toward Williamson, he stepped off the existing portion of the roof onto the exposed insulation and fell through the insulation forty feet to the floor of the building, suffering catastrophic injuries resulting in quadriplegia.

In December 1993, Stephan Roethke and Karen Roethke filed this action for damages (Stephan for his personal injuries, Karen for her loss of consortium) against their own corporation/employer, D & B Roofing, claiming that Stephan's injuries were caused by D & B's negligent installation of the roof. (The Roethkes had rejected coverage under the Workers' Compensation Act. KRS 342.395.) They also sued Chris Sanger, claiming that he negligently supervised the installation of the roof, and "Sanger Crane Service," claiming that it, as Chris Sanger's employer, was vicariously liable for Sanger's negligence. In July 1997, the Roethkes' two minor children, Appellants Kaela and Stephanie Roethke, intervened to also assert claims for loss of consortium. *Giuliani v. Guiler*, Ky., 951 S.W.2d 318 (1997). Judgments were ultimately entered in favor of Stephan Roethke in the sum of $1,869,560.47, in favor of Karen Roethke in the sum of $780,000.00, and in favor of the Roethke children in the sum of $10,000.00. Those judgments, however, were not entered against D & B Roofing, Chris Sanger, or "Sanger Crane Service," all of whom had been released prior to trial in unsuccessful attempts by the Roethkes to recover by assignment the proceeds of various insurance policies. Instead, the judgments were entered against Chris Sanger's father, Appellee Larry Sanger, who had never discussed the details of the Monticello job with either Roethke or Chris Sanger, had never visited the Monticello job site, and had never received any payment for work performed on that job. The trial court's theory of Larry Sanger's liability was that Larry and Chris Sanger were either partners or "implied partners" in the crane service business, and thus, Larry was vicariously liable for Chris's negligent performance of the roof installation job.

Prior to moving to Jeffersonville, Indiana, in 1989, Larry Sanger lived in Lebanon, Pennsylvania, and was engaged in the business of erecting small steel buildings under the certified assumed name of "Sanger Construction Company." *Cf.* KRS 365.015. However, he had never erected a building with a standing seam metal roof. He owned two cranes that he used both in his construction business and as a private contractor of crane service work for other construction companies that did not own their own cranes. To advertise this sideline business, he painted the words "Sanger Crane Service" on the sides of both cranes. He did not obtain an assumed name certificate for his crane service business. His son, Chris Sanger, worked for him during summers while in high school and for a year after graduation. Chris participated in the construction of three small metal buildings and learned to operate the cranes. When Larry Sanger and his wife moved to Indiana, Chris remained in Pennsylvania. Larry took the larger of his two cranes, a 15-ton hydraulic crane mounted on a 1981 Ford tractor truck, to Indiana. He sold Chris his smaller crane, the 10-ton RO Stinger mounted on the 1975 Ford truck, for $35,000.00. Defendant's trial exhibit No. 3 is a financing statement proving that the Farmers Trust Company of Lebanon, Pennsylvania, financed Chris's purchase of

an "RO Stinger TC120 Crane, Serial No. 351." The loan was cosigned by one of Larry's former crane service customers who intended to continue doing business with Chris. Chris kept his father's Pennsylvania customers and continued to perform crane service work as "Sanger Crane Service."

Upon moving to Indiana, Larry Sanger opened a bank account under the name "Sanger Construction and Crane Service." He did not resume his former business of constructing metal buildings. Instead, he operated his crane service business, which he continued to call "Sanger Crane Service," on a full-time basis. His home at 1931 Utica Pike in Jeffersonville was also his office, and customers who needed crane service would contact him at his home telephone number. In April 1992, Chris Sanger moved from Pennsylvania to Indiana and took up residence at his parents' home in Jeffersonville. He brought with him the 10-ton RO Stinger crane mounted on the 1975 Ford truck, and Larry agreed to give Chris some of his crane service business. They discussed the possibility of a partnership, but were unable to agree on terms. They finally agreed to operate separately with each keeping the money he earned with his own crane.

Chris opened a bank account under the name of "Chris Sanger or Sanger Crane Service." Thereafter, when a call came to the Sanger home/office for crane service, Larry would decide who would get the job. Either way, the charge was $55.00 per hour. Invoices were sent to customers under the name "Sanger Crane Service" with remittance payable to "Sanger Crane Service, 1931 Utica Pike, Jeffersonville, Indiana." Upon receipt of a remittance, the check would be deposited in the bank account of the one who had performed the work. If a customer remitted payment for several invoices with one check, and if some of those invoices were for work performed by Larry and others for work performed by Chris, the check would be deposited in Larry's bank account. Larry would then write a check to Chris for the sum of the invoices that represented work performed by Chris. Plaintiff's exhibit no. 14 contains copies of checks written on Larry Sanger's account payable to Chris Sanger for "crane work." For tax purposes, Larry claimed all deposits to his account as business income and deducted amounts paid to Chris as business expenses.

D & B Roofing was one of Sanger Crane Service's regular customers. When D & B needed crane service, Roethke would call the Sanger residence and request a crane. Chris Sanger and Stephan Roethke became close friends and Larry usually gave the D & B jobs to Chris. An invoice would be sent to D & B under the name "Sanger Crane Service" and Roethke would remit a check payable to "Sanger Crane Service." D & B often paid several invoices with one check. If the check was for work performed by both Sangers, Larry would deposit the check in his account and write Chris a check in the amount representing his portion of the work.

## II. PARTNERSHIP.

Presumably, the origin of the trial judge's theory of "implied partnership" was this quote from *Guthrie v. Foster,* 256 Ky. 753, 76 S.W.2d 927 (1934):

The question of the effect of holding out as partners arises only in dealing with third persons, and cannot be raised between the parties themselves, for everyone is presumed to know who are his associates in business. Persons may, therefore, be made liable as partners as far as third persons are concerned by assertions, admissions and acts tending to show that they are such, although

such evidence might be insufficient to prove a partnership as between the parties themselves.

*Id.*, 76 S.W.2d at 929 (quoting 20 R.C.L. 1067, 1068).

That case was a dispute between one purported partner and the heirs of another over the proceeds of the deceased purported partner's life insurance policy; thus, the quoted language was *dicta*, and the issue of potential liability to third parties was not further discussed. Although there are common law cases relying on circumstantial evidence to find the existence of an actual partnership for the purpose of determining the rights and liabilities of the alleged partners with respect to each other, *e.g., Graf v. Woodruff*, 244 Ky. 557, 51 S.W.2d 908 (1932), no Kentucky case has applied a theory of "implied partnership" to create vicarious tort liability in favor of a third party.

However, regardless of any common law theories, the existence or nonexistence of a partnership in 1992 between Larry and Chris Sanger was governed by the Uniform Partnership Act (UPA), promulgated by the Conference of Commissioners on Uniform State Laws in 1914[1] and adopted as the law of Kentucky in 1954.[2] Thus, the facts of this case are governed, not by pre-existing common law cases, but by the following statutory provisions:

*KRS 362.165* provides that the rule that statutes in derogation of the common law are to be strictly construed has no application to the Uniform Partnership Act. It also provides that the laws of estoppel and agency apply to the Act.

*KRS 362.175* defines a partnership as "an association of two (2) or more persons to carry on as co-owners a business for profit."

*KRS 362.180* is entitled "Rules for determining the existence of a partnership" and provides in pertinent part:

(1) *Except as provided by KRS 362.225 [partner by estoppel] persons who are not partners as to each other are not partners as to third persons.*

(2) Joint tenancy, tenancy in common, tenancy by the entireties, joint property, common property, or part ownership does not of itself establish a partnership, whether such co-owners do or do not share any profits made by the use of the property.

(3) The sharing of gross returns does not of itself establish a partnership, whether or not the persons sharing them have a joint or common right or interest in any property from which the returns are derived.

(4) The receipt by a person of a *share of the profits* of a business is prima facie evidence that he is a partner in the business, but no such inference shall be drawn if such profits were received in payment:

(a) As *a debt* by installments or otherwise;

(b) As wages of an employee or *rent to a landlord;*

. . . (Emphasis added.)

*KRS 362.190(1)* provides:

Subject to the limitations set forth in KRS 362.220 [limited partnerships], every partner shall be an agent of the partnership *for the purpose of its busi-*

---

**1.** 6 *Uniform Laws Annotated,* Uniform Partnership Act 7 (West 1969).

**2.** 1954 Ky. Acts, ch. 38. To date, Kentucky has not adopted the Revised Uniform Partnership Act (RUPA), finalized by the National Conference of Commissioners on Uniform State Laws in 1996. R. Hillman, A. Vestal and D. Weidner, *The Revised Uniform Partnership Act* 3 (West 2000).

*ness,* and the act of every partner, including the execution in the partnership name of any instrument, *for apparently carrying on in the usual way the business of the partnership* of which he is a member shall bind the partnership, unless the partner so acting has in fact no authority to act for the partnership in the particular matter, *and the person with whom he is dealing has knowledge of the fact he has no authority.* (Emphasis added.)

*KRS 362.210* provides:

When, by any wrongful act or omission of any partner *acting in the ordinary course of the business of the partnership or with the authority of his co-partners,* loss or injury is caused to any person, not being a partner in the partnership, or any penalty is incurred, the partnership is liable therefor to the same extent as the partner so acting or omitting to act. (Emphasis added.)

*KRS 362.220(1)(a)* provides that all partners are jointly and severally liable for everything chargeable to the partnership under KRS 362.210.

*KRS 362.225* is entitled "Partner by estoppel" and provides:

(1) When a person, by words spoken or written or by conduct, represents himself, or consents to another representing him to anyone, as a partner in an existing partnership . . . he is liable to any such person to whom such representation has been made, who has, *on the faith of such representation* given credit to the actual or apparent partnership, and if he has made such representation or consented to its being made in a public manner he is liable to such person whether, the representation has or has not been made or communicated to such person so giving credit by or with the knowledge of the apparent partner making the representation or consenting to its being made;

(a) When a partnership liability results, he is liable as though he were an actual member of the partnership.

. . .

(2) When a person has been thus represented to be a partner in an existing partnership, or with one or more persons not actual partners, *he is an agent* of the persons consenting to such representation to bind them to the same extent and in the same manner as though he were a partner in fact, *with respect to persons who rely upon the representation . . . .* (Emphasis added.)

*A. "[N]ot partners as to each other." KRS 362.180(1).*

■ There is no evidence whatsoever in this case to support a conclusion that the Sangers were *actual* partners in the crane service business. KRS 362.180, *supra.* They did not share profits. They were not co-owners of any property. Each owned his own equipment, and each kept the money that he separately earned. Appellants' assertion that Larry Sanger depreciated Chris Sanger's crane on his income tax return is patently incorrect. Larry's tax return (Defendant's exhibit no. 4) claims depreciation for a 1969 White crane truck, a 1981 Ford crane truck, and a 1985 Ford 8000 boom truck. (Presumably, the depreciation for each vehicle included not only the truck but the crane affixed thereto.) The depreciation schedule reflects that the 1985 Ford truck was purchased on September 1, 1993, nine months after Roethke's accident. The depreciation schedule does not include a 1975 Ford crane truck or an RO Stinger crane.

On December 16, 1992, the day before work on the Gamble Brothers job began,

D & B gave Chris Sanger a $300.00 check for advanced expenses. The Roethkes make much ado of the fact that Chris subsequently endorsed this check over to Larry who deposited it in his (Larry's) bank account. Larry surmised at trial that Chris gave him the check as payment for some fuel. Chris surmised that he gave the check to Larry either as a rent payment or to repay a loan. KRS 362.180(4)(a), (b), *supra.* Regardless, under no interpretation could Larry's ultimate possession of a check for advanced expenses be regarded as a "share of the profits" from the Gamble Brothers job. *See* KRS 362.180(3) and (4), *supra.* Not one cent of the approximately $15,000.00 paid to Chris Sanger by D & B for *work performed* on the Gamble Brothers job was ever paid to Larry Sanger, directly or indirectly.

### B. Partner by estoppel. KRS 362.225.

Since the Sangers were not partners as to each other, they could only be partners as to the Roethkes if they were partners by estoppel as defined in KRS 362.225, *supra. See* KRS 362.180(1), *supra.* The latter statute is a verbatim adoption of section 7 of the UPA and represents a repudiation of the ancient doctrine of "partnership as to third persons" under which courts formerly implied the existence of partnerships in order to spread liability for losses to third parties in cases where no partnership would otherwise be found. R. Hillman, A. Vestal and D. Weidner, *The Revised Uniform Partnership Act, supra,* note 2, § 308, Comment 1, at 160 (citing *Martin v. Peyton,* 246 N.Y. 213, 158 N.E. 77, 78 (1927): "Much ancient learning as to partnership is obsolete. Today only those who are partners between themselves may be charged for partnership debts by others.").

The evidence as to how the Sangers represented their crane service business to the public, including the Roethkes, would support a finding of partnership by estoppel with respect to that business, assuming proof of reliance. KRS 362.225(1), *supra.* Both Sangers used the same business address and telephone number and operated under the same fictitious name of "Sanger Crane Service." Their invoices were identical and their customers were directed to remit all payments to the fictitious name listed on the invoices. KRS 362.225 is a verbatim adoption of UPA § 16, 6 *Uniform Laws Annotated, supra,* note 1, at 195, *et. seq.,* and there is authority for the proposition that a partnership by estoppel creates only contractual liability, not tort liability. *Pruitt v. Fetty,* 148 W.Va. 275, 134 S.E.2d 713, 716–17 (1964). That issue has never been addressed in Kentucky, though the language of KRS 362.225 seems directed more at contractual than at tort liability, *viz:* "[H]e is liable to any such person to whom such representation has been made, who has on the faith of such representation *given credit to* the actual or apparent partnership ...." KRS 362.225(1) (emphasis added). That issue, however, need not be addressed here because Chris Sanger did not cause Stephan Roethke's injuries while acting in "the ordinary course of the" crane service business, KRS 362.210, *supra,* and the Roethkes did not hire Chris Sanger "on the faith of such representation" or in reliance on Larry Sanger being his partner. KRS 362.225(1), (2).

### C. "Ordinary course of the business" or "with the authority of his co-partners." KRS 362.210.

 The fact that two persons are partners in a particular business does not mean that each is vicariously liable for the negligent acts of the other committed outside "the ordinary course of" that business. "Where the partner whose negligence caused damage to a third party act-

ed outside the purview of the partnership business ... he alone is responsible." 59A Am.Jur.2d, *Partnership*, § 653 (1987). For example, if a member of a law partnership privately owned a farm, his law partners would not be vicariously liable for his negligent operation of a tractor while engaged in farming. And if the lawyer/farmer had a partner in his farm operation, the farm partner would not be vicariously liable for legal malpractice committed by the lawyer in the course of his law practice. Vicarious liability extends only to negligent acts of an agent committed in the course and scope of the principal's business. And the test is the same whether the agency relationship is one of partnership, principal/agent, or master/servant. KRS 362.210, *supra*; *Wolford v. Scott Nickels Bus Co.*, Ky., 257 S.W.2d 594, 595 (1953) (principal/agent); *Hines v. Walls*, 194 Ky. 379, 239 S.W. 451, 453 (1922) (master/servant).

In *Osborne v. Payne*, Ky., 31 S.W.3d 911 (2000), we held that a Roman Catholic diocese was not vicariously liable for sexual misconduct committed by a parish priest during the performance of his admitted duties as a marriage counselor.

The critical analysis is whether the employee or agent was acting within the scope of his employment at the time of his tortious act. *Wood v. Southeastern Greyhound Lines*, 302 Ky. 110, 194 S.W.2d 81 (1946), provides that for it to be within the scope of its (sic) employment, the conduct must be of the same general nature as that authorized or incidental to the conduct authorized. A principal is not liable under the doctrine of respondeat superior unless the intentional wrongs of the agent were calculated to advance the cause of the principal or were appropriate to the normal scope of the operator's employment. *Hennis v. B.F. Goodrich Co. Inc.*, Ky., 349

S.W.2d 680 (1961).... It is beyond question that Osborne was not advancing any cause of the diocese or engaging in behavior appropriate to the normal scope of his employment.

*Id.* at 915.

The business of "Sanger Crane Service" was crane service, not roof installation. Roethke knew that. KRS 362.190(1), *supra*. When he needed crane service, Roethke hired "Sanger Crane Service" and remitted payment directly to "Sanger Crane Service" with checks payable to "Sanger Crane Service." But when he needed a construction foreman to supervise his own employees in the installation of a standing seam metal roof, he did not hire "Sanger Crane Service;" he hired Chris Sanger. He received no invoices from "Sanger Crane Service" and did not remit any payments to "Sanger Crane Service" for Chris Sanger's work. Chris submitted his expense claims on tablet paper, not a "Sanger Crane Service" invoice, and all payments for expenses, salary and crane use were made by checks payable to "Chris Sanger," not "Sanger Crane Service." Nor was Chris Sanger paid the hourly rate normally charged for work performed by "Sanger Crane Service." He was paid $250.00 per day to supervise the roof installation and $100.00 per day for the use of his crane. Neither Larry Sanger nor "Sanger Crane Service" was paid anything at all for work performed by Chris Sanger on the Gamble Brothers job.

Stephan Roethke was not injured by Chris Sanger's negligent operation of his crane, and the opening through which Roethke fell was not created by the operation of the crane. Roethke's claim of negligence was that the opening should have been covered or barricaded, or that signs should have been erected to warn unwary persons on the roof. The jury was in-

structed only that Chris Sanger had a duty "to use ordinary care to provide a safe work place for people on the roof," a duty unrelated to "the ordinary course of the" crane service business. KRS 362.210, *supra*.

■ If a partner's wrongful act is not committed during the ordinary course of the business of the partnership, a co-partner is liable only if he consented to or authorized the act. *Id.; Ellis v. Mihelis,* 60 Cal.2d 206, 217, 32 Cal.Rptr. 415, 384 P.2d 7 (1963). Larry Sanger was never in Monticello and never discussed the details of the Gamble Brothers job with either Stephan Roethke or Chris Sanger. There is no evidence that he consented to or authorized the method by which the old roof was removed and the new roof installed, or even that he, himself, knew how to install a standing seam metal roof. Nor could he have had any knowledge of any warnings or lack thereof provided to Roethke and other persons on the roof at the time of the accident. Appellants' assertion that Larry Sanger "fully discussed the details of the Monticello job with both Steve Roethke and Chris before deciding to send Chris [to do the job]" is unsupported by the evidence at trial. Stephan Roethke testified that the reason he did not offer the Gamble Brothers job to Larry Sanger was because he knew Larry did not have time to do it and that his only conversation with Larry about the job was a telephone call in which he asked Larry if it would be all right for Chris to take the job because "I wanted him to have a clear understanding that his son would be out of town for some time." Chris Sanger testified that he asked Larry whether he would object to his (Chris's) prolonged absence from the crane service business and whether he should accept Roethke's offer of permanent employment; and that Larry advised him to work with Roethke on the Monticello job and see how it went, "to see if he thought he [Roethke] would be a good person to work for." Larry testified that he did not object to Chris accepting employment with Roethke because Roethke was offering Chris more money than he could make in the crane service business and "I would be rid of him." (I) That is a far cry from "fully discuss[ing] the details of the Monticello job with both Steve Roethke and Chris Sanger" and "deciding to send Chris" to do the job. There was no evidence at trial to support a conclusion that Chris Sanger was acting "with the authority of" Larry Sanger in the performance of the Gamble Brothers job.

*D. "With respect to persons who rely upon the representation." KRS 362.225(2).*

■ Finally, no partnership by estoppel in favor of the Roethkes could have occurred with respect to the Gamble Brothers job because an essential element of any estoppel is reliance, *e.g., Gailor v. Alsabi,* Ky., 990 S.W.2d 597, 604 (1999), and a partnership by estoppel, as defined by UPA § 16 (KRS 362.225), requires reliance by the person claiming vicarious liability. *McBriety v. Phillips,* 180 Md. 569, 26 A.2d 400, 405 (1942); *Nat'l Premium Budget Plan Corp. v. Nat'l Fire Ins. Co.,* 97 N.J.Super. 149, 234 A.2d 683, 729–30 (Law Div.1967); *Pruitt v. Fetty, supra; Wisconsin Tel. Co. v. Lehmann,* 274 Wis. 331, 80 N.W.2d 267, 270 (1957). Even the trial judge remarked during the instruction conference that if reliance was a required element of "implied partnership," Larry Sanger would be entitled to a directed verdict. In that respect, he was correct; but he was incorrect in his conclusion that Kentucky law, presumably *Guthrie v. Foster, supra,* does not require reliance as an element of implied partnership. *Guthrie* did not mention reliance because it was not a case in which a third party

was attempting to hold an alleged partner vicariously liable. Regardless, *Guthrie* was superseded by the enactment of KRS 362.225(2), *supra*, which explicitly requires reliance.

Both Roethkes testified that they relied solely on Chris Sanger's ability to get the job done and did not expect Larry Sanger to be involved in the job in any way. Stephan Roethke testified that he did not ask Larry Sanger to participate in the job and did not expect him to provide any expertise, but "relied entirely on Chris." Neither of the Roethkes testified that either Larry or Chris Sanger did or said anything to represent that Chris was supervising the Gamble Brothers job as a part of the business of "Sanger Crane Service." Stephan Roethke testified he knew the job "was not something Chris was used to doing." And he obviously knew the crane belonged to Chris, not Larry, because he testified that he and Chris had already discussed what to do with the crane if Chris accepted the offer of permanent employment. Finally, both Roethkes knew that, with respect to the Gamble Brothers job, Chris Sanger was an employee of D & B Roofing, not Sanger Crane Service. Long before the Roethkes amended their complaint to add Larry Sanger as a party defendant, they filed an amended complaint against D & B's liability insurer, United States Fidelity and Guaranty Company (USF & G), claiming that USF & G owed coverage for Chris Sanger's negligence because Chris was employed by D & B at the time of the accident.

### III. OSTENSIBLE AGENCY.

▆▆▆ Appellants argue in the alternative that Larry Sanger could be held vicariously liable to the Roethkes because Chris Sanger was Larry Sanger's "ostensible agent." The leading and most recent Kentucky case on the doctrine of ostensible agency is *Paintsville Hospital Co. v. Rose*, Ky., 683 S.W.2d 255 (1985). There, the plaintiff's decedent was found unconscious on the street and taken to a hospital where his condition was allegedly misdiagnosed by a private, "on call" physician who, though not an employee of the hospital, was held to have been an "ostensible agent" of the hospital at the time of the misdiagnosis. Appellants posit that since the plaintiff's decedent in *Paintsville Hospital* was unconscious during the diagnosis, he could not have relied on the ostensible agency relationship; *ergo*, reliance is not an element of ostensible agency. However, in *Paintsville Hospital*, we adopted the definition of "ostensible agent" set forth in *Restatement (Second) of the Law of Agency*, § 267 (A.L.I.1958):

> One who represents that another is his servant or other agent *and thereby causes a third person justifiably to rely* upon the care or skill of such apparent agent is subject to liability to the third person for harm caused by the lack of care or skill of the one appearing to be a servant or other agent as if he were such.

683 S.W.2d at 257 (emphasis added). Although the definition specifically requires justifiable reliance, *Paintsville Hospital* went on to hold that reliance need not be proven by express testimony but can be proven by circumstantial evidence *absent evidence of actual knowledge to the contrary on the part of the person asserting ostensible agency*.

> [E]vidence sufficient to invoke the doctrine has been inferred from circumstances similar to those shown in the present case, · absent evidence that the patient knew or should have known that the treating physician was not a hospital employee when the treatment was performed (not afterwards).

*Id.* at 256 (emphasis added). Thus, the absence of a requirement of express evidence does not equate with an absence of the requirement of reliance—and express evidence of reliance is required when there is evidence, as here, that the person claiming ostensible agency knew or should have known that no agency relationship existed with respect to the job being performed. Thus, there is little difference between the Restatement's definition of "ostensible agent" and the UPA's definition of "partner by estoppel." Both require reliance on the part of the party seeking to hold the principal or partner vicariously liable. Since both Roethkes admitted that, when they hired Chris Sanger to do the Gamble Brothers job, they did not do so in reliance on his relationship with Larry Sanger, the doctrine of ostensible agency has no application to this case.

## IV. JOINT ENTERPRISE.

 Sometimes referred to as a joint adventure, a joint enterprise is "an informal association of two or more persons, partaking of the nature of a partnership, usually, but not always, limited to a single transaction in which the participants combine their money, efforts, skill, and knowledge for gain, with each sharing in the expenses and profits or losses." *Eubank v. Richardson,* Ky., 353 S.W.2d 367, 369 (1962); *see also Drummy v. Stern,* Ky., 269 S.W.2d 198, 199 (1954). In *Huff v. Rosenberg,* Ky., 496 S.W.2d 352 (1973), we enumerated the elements essential to a joint enterprise, *viz:* "(1) an agreement, express or implied, among the members of the group; (2) a common purpose to be carried out by the group; (3) a community of pecuniary interest in that purpose among the members; and (4) an equal right to a voice in the direction of the enterprise, which gives an equal right of control." *Id.* at 355 (citing Restatement (Second) of the Law of Torts, § 491, cmt. c

(A.L.I.1965)). As to element number 3, it is necessary to the relationship that there be a sharing of the profits and losses; though in the absence of an express agreement, the sharing of losses may sometimes be implied from an express agreement to share profits. *Drummy v. Stern, supra,* at 199.

There was no express agreement that Larry Sanger would share in the profits of the Gamble Brothers job and he did not do so. Nor did he have an equal right of control with respect to the manner in which the job was performed. Thus, the theory of joint enterprise has no application to this case.

Accordingly, the decision of the Court of Appeals is affirmed.

GRAVES, JOHNSTONE and KELLER, JJ., concur.

WINTERSHEIMER, J., dissents by separate opinion with LAMBERT, C.J., and STUMBO, J., joining that dissenting opinion.

WINTERSHEIMER, Justice, dissenting.

I must respectfully dissent from the majority opinion because there was sufficient evidence under the law of Kentucky to impose vicarious liability. The learned legal essay provided in the majority opinion has only one flaw. It is in error. I respectfully differ with the analysis of the partnership question. The opinion goes far beyond the issue presented and is largely concerned with issues about the Uniform Partnership Act which were not briefed or orally argued. A reviewing court should not redefine the issues nor substitute its view for that of the trial judge or jury unless the result is clearly erroneous. *Cf. Bierman v. Klapheke,* Ky., 967 S.W.2d 16 (1998).

The father and son used the same business name, address and telephone number; the name painted on the side of each crane was the same; the bills made no differentiation between the two businesses; the father took a business depreciation for both cranes on his income tax. The father in effect ran the business and the first check for this particular job, although payable to the son, was deposited in the bank account of the father. Surely this was sufficient evidence of a partnership, ostensible agency, or joint enterprise to sustain the jury verdict.

The trial judge declined to enter a directed verdict for either party and instructed the jury that the father could only be held liable for the negligence of the son if the jury believed they were engaged in a partnership or implied partnership and the son was engaged in the business of the partnership when the accident occurred. The terms of the instructions were defined as follows: Two people are engaged in a partnership when they agree to share the profits and losses of a business carried out by them and a partnership is implied where two people voluntarily hold themselves out to the public as being in business together.

The jury found the existence of a partnership and awarded damages. The Court of Appeals reversed stating that there was insufficient evidence to impose vicarious liability on the father.

Larry Sanger did not file a cross-motion for discretionary review and thus only those issues decided by the Court of Appeals should be addressed by this Court. *Gailor v. Alsabi,* Ky., 990 S.W.2d 597 (1999). The Roethkes did file a cross-appeal with the Court of Appeals, arguing that the trial judge erred in denying their motion for a directed verdict on the basis of ostensible agency. The Court of Appeals rejected the Roethke argument regarding ostensible agency.

The Court of Appeals and the majority of this Court have improperly substituted its judgment for that of the jury. A reviewing court cannot substitute its version of the jury verdict for that of a duly impaneled jury unless the failure to grant a directed verdict was clearly erroneous or the verdict was flagrantly against the evidence so as to indicate it was reached as a result of passion or prejudice. *Cf. Bierman, supra.* The reviewing court must respect the opinion of the trial judge who heard the evidence because the trial judge is in the best position to determine whether a jury can properly consider the evidence. *Bierman.* Where there is conflicting evidence, it is the responsibility of the jury to determine and resolve such conflicts as well as matters affecting the credibility of witnesses. *Bierman, citing Taylor v. Kennedy,* Ky.App., 700 S.W.2d 415 (1985). The task of interpreting inferences to be drawn from the evidence is uniquely and historically suited for juries. *Cf. Horton v. Union Light, Heat and Power Co.,* Ky., 690 S.W.2d 382 (1985).

As a result of the evidence presented, the jurors upon proper instruction found Larry Sanger vicariously liable under principles of implied partnership. The Court of Appeals and the majority of this Court have substituted its own opinion as to the evidence and the legal conclusions in this case, thereby usurping the province of the jury.

A business may be conducted by two or more persons in a fashion that will constitute an implied partnership. *Crider v. Providence Coal Mining Co.,* 242 Ky., 514, 46 S.W.2d 1072 (1932); *Graf v. Woodruff,* 244 Ky. 557, 51 S.W.2d 908 (1932).

The intent of the parties to form a partnership may be implied and it need not be expressed in writing or orally. The legal

effects of their relation follow whether or not the parties foresee and intend them, and it is immaterial that the parties do not realize that they are partners. *See* 59A Am.Jur.2d *Partnership* § 152 (1987).

"In the presence of an intent to do those things which constitute a partnership, the parties will be considered partners even though they intend to avoid the liability attaching to partners, or expressly stipulate in their agreement that they are not partners." *Id.* at § 153. In addition, ". . . an agreement which attempts to carry out a joint venture for the mutual profit of the adventurers while evading the responsibility for losses, may be enforced and construed as a partnership." *Id.*

In view of the extensive argument about the status of a joint venture and the lengthy discussion by the Court of Appeals which ultimately concluded that there was insufficient evidence to support such a theory, I believe it is necessary to explain my position on the subject. Generally, a joint venture is described as a business arrangement intended to carry out a single venture for profit. 46 Am.Jur.2d *Joint Ventures* § 1 (1994). Here, Larry and Chris Sanger were in business together for a number of years. Although it has been observed that courts have not set out any certain definition of what constitutes a joint venture, nor have they established a very fixed or certain boundary of the concept, contenting themselves in determining whether the facts of a particular case constitute the relationship of joint venture. *See Kahle v. Turner*, 66 Ohio App.2d 49, 420 N.E.2d 127 (1979). *See* 46 Am.Jur.2d *Joint Ventures* § 1(1994).

It is further observed that the use of a joint venture has become more common as a means of providing the great concentration of economic resources knowledge and skill to accomplish large-scale construction projects such as public buildings, bridges, tunnels, super highways, power dams, canals, seaways and power projects. *Id.* at § 2. In any event, joint ventures are generally governed by the same rules as partnerships. *Id.* at § 3. The trend in the law has been to blur the distinction between a partnership and a joint venture. *Id.* As a result, I am persuaded that the liability for torts of parties to a joint venture agreement is governed by the law applicable to partnerships in this case. *Id.* The business relationship of a partnership can be distinguished from a joint venture because the joint venture is a specific undertaking for profit as opposed to a general ongoing business. *Id.* at § 14. The distinction between partnership and the joint venture is highly fact intensive. Thus, it is a proper consideration for a jury to determine the specific facts of a particular case.

An action for negligence may lie between joint venturers when the negligence results in injury to a person seeking to recover damages. *Duffy v. Piazza Constr., Inc.*, 62 Wash.App. 19, 815 P.2d 267 (1991).

Each party to a joint venture is jointly and severally liable for the tortious acts of the other committed within the scope of the business of the venture. The individual parties are liable for injuries to third parties for injuries based on their mutual undertaking. As in the case of partnerships, the nature of a joint venture is such that any negligence on the part of one party may be imputed to the other. *See* 46 Am.Jur.2d *Joint Ventures* § 42 (1994). In this case, it has no significant value to seek refuge in a joint venture theory. The outcome should be the same.

I would note that acts are interpreted in the light of ordinary human experience. If the principal puts one into, or knowingly permits him to occupy, a position in which, according to the ordinary experience and habits of mankind, it is usual for the occu-

pant to have authority of a particular kind, anyone having occasion to deal with one in the position is justified in inferring that the person in question possesses such authority unless the contrary is then made known. Restatement of Law of Agency § 49 Comment b (1958); *See also Williams v. St.Claire Medical Center,* Ky. App., 657 S.W.2d 590 (1983).

In this case the instructions given by the trial court were clear and easily understood by the jury. There was sufficient evidence to indicate that Larry and Chris Sanger had entered into a common business arrangement for their mutual benefit. There was evidence regarding the close relationship between the father and son in the business.

The enumerated requirements of *Huff v. Rosenberg,* Ky., 496 S.W.2d 352 (1973), are in conflict with a number of other Kentucky cases that hold that a joint venture exists when persons embark upon a common enterprise for their mutual benefit. *Lappas v. Barker,* Ky., 375 S.W.2d 248 (1963). *Rosenberg, supra,* involves the vicarious liability for negligent operation of an automobile owned by the parents but operated by the son. Clearly, this is a nonbusiness operation and does not control the business situation presented here. The ongoing business relationship demonstrated by the Sangers was a common business enterprise for their mutual profit. The jury recognized that factual situation and based their verdict on it. There was no error.

LAMBERT, C.J., and STUMBO, J., join this dissent.